Filed 3/7/24  Lucas v. The Law Offices of Nathan Mubasher CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| BETSAIDA SANTANA LUCAS, | |
| Plaintiff and Appellant, | E078620 |
| v. | (Super.Ct.No. RIC1723893) |
| THE LAW OFFICES OF NATHAN MUBASHER et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County.  Chad W. Firetag, Judge. Affirmed.

Betsaida Santana Lucas, in pro. per., for Plaintiff and Appellant.

The Law Offices of Herb Fox and Herb Fox for Defendants and Respondents.

Plaintiff and appellant Betsaida Santana Lucas (Client) sued her former attorney, Nathan Mubasher (Attorney) for legal malpractice, breach of fiduciary duty, fraud, and other causes of action.  A jury found in favor of Attorney.  Client raises two issues on appeal.  First, Client contends the trial court erred by permitting Attorney's expert to

1

testify about transference, which allegedly went beyond the scope of the expert's written report.  Second, Client asserts the trial court erred by excluding evidence she intended to use to impeach Attorney.  We affirm.[1]

## FACTS

A.    <u>LAWSUIT</u>

1.    *CLIENT'S CASE*

Client hired Attorney in January 2015.  Attorney represented Client in a lawsuit against a restaurant Client had patronized.  Client alleged that, in January 2017, without Client's approval, Attorney dismissed, without prejudice, Client's lawsuit against the restaurant.  Client alleged she paid $21,985 for very little work by Attorney, and that Attorney essentially "defraud[ed] her out of tens of thousands of dollars knowing full well he never intended to satisfactorily represent any of [Client's] legal interests."  Client alleged that part of Attorney's fraud involved him leading Client to believe they had a romantic relationship.

2.    *ATTORNEY'S DEFENSE*

Attorney contended he performed an "extensive amount of work" for Client and "went above and beyond . . . to help [Client]."  Attorney contended Client approved the dismissal of her case against the restaurant.  Further, Attorney alleged that Client sent

---

[1] Attorney asserts Client's "Appellant's Opening Brief suffers from omissions, misstatements and violations of appellate Rules of Court," and the record Client provided is incomplete.  Attorney asserts that "this Court can and should find that [Client] has waived her right to appellate review."  We reject Attorney's argument and address the merits of Client's contentions.

him a torrent of romantic emails.  Attorney directed Client to stop expressing romantic feelings for him, and when she refused to cease, he withdrew as her counsel.

B.    EMAILS

The following are excerpts from three of Client's many emails to Attorney. First, from May 26, 2016: "You are professional perfection.  I think you are this planets [*sic*] most perfect human being.  You can do no wrong.  My feelings for you are overwhelming."  Second, from June 1, 2016:  "I love you with everything I am."  Third, from June 3, 2016:  "I am deeply in love with you, and I love you.  I want to fulfill your deepest desires, I want to make you smile and think the world of me.  [¶]  I want you to make love to me.  I want us to make a baby together."

The following are three excerpts from Attorney's emails to Client.  First, on July 18, 2016:  "What you are feeling is quite common in a professional-client relationship. It's called erotic transference. . . .  [¶]  I urge you to ask your therapist about erotic transference and to ask him about your emails to me."  Second, on November 3, 2016: "Thank you for sharing your feelings.  However, I cannot reciprocate them as I am your lawyer. . . .  [¶]  . . .  [¶]  Because you can't control yourself, it is clear to anyone you are going through emotionally driven erotic transference."

Third, on February 11, 2017:  "I understand and acknowledge you have intense and positive feelings for me.  That makes me neither mad nor annoyed.  Also, transference is actually predicted in a situation where I am 'fighting for you' as it is common in attorney and therapy contexts.  But any ethical attorney or therapist will not

3

reciprocate. . . . Just to be clear, I'm flattered you have feelings for me but I cannot reciprocate as I am your attorney."

### C.      EXPERT'S REPORT

Attorney designated David L. Braff, M.D., (Braff) of the University of California, San Diego, Department of Psychiatry, as an expert. Braff interviewed Client on April 7, 2021. Braff concluded that Client "has had severe psychiatric problems virtually her whole life," including a complex personality disorder.

In his report, Braff opined, "[Client] (from her emails) seems to have been very attached to [Attorney] and then to be severely disappointed and even vengeful for what she perceives to be unfair treatment. This approaches what has been called delusional erotomania." Braff continued, "[Client] is very upset that she did not get what she wanted from [Attorney] which may well have included a personal relationship."

### D.      MOTION IN LIMINE

Client moved in limine to limit Braff's testimony "to the matters which he opined in his written, undated report." The trial court granted the motion, and said that the "report speaks for itself, . . . that there is a sense of transference, where the purported or alleged romantic relationship is not actually there, to put it bluntly." Thereafter, the following exchange occurred:

Client: "[Braff] made no mention of transference nor was that discussed."

Attorney's attorney: "Well, that may be true. I think the clinical term Dr. Braff used was delusional erotomania. The transference is not the disorder."

"The Court:  Right.  I mean I think that's the layman's term, if you will . . . .  [¶] . . . [¶]  When I say I would allow the doctor to testify to what is included in his report, I mean he cannot come up and say there's a different diagnosis here. . . .  He can certainly elaborate on [his diagnoses] and let the jury know so that they can understand what that means, but I would limit it to the opinions made in his report."

E.    TRIAL

Braff's report was admitted into evidence.  At trial, Braff testified, "I think [Client] said [Attorney] wanted to have a relationship, of course, in a thousand e-mails, she's asking him to have her children.  The whole thing at first didn't make sense to me, except that she's constructing things either as she sees them or in a distorted way."  During Braff's testimony, the following exchange occurred:

Attorney's attorney:  "[Y]ou reviewed her . . . hundreds, if not thousands, of e-mails that she sent to [Attorney], correct?

"[Braff:]  Yes.

"[Attorney's attorney:]  Where she clearly expressed romantic feelings towards him, correct?

"[Braff:]  Yeah.  I want to have your children is a pretty romantic, I think, feeling.

"[Attorney's attorney:]  Did you see any—in any of these thousands of e-mails that you looked at, anywhere [Attorney] showed interest in her or reciprocated her feelings?

"[Braff:]  No.

5

"[Attorney's attorney:]  Did you see any e-mails where he, in fact, told her the opposite?  I am not interested in you.  I am ethically not permitted to even have a relationship with you because I'm your lawyer, and you need to stop this, et cetera, et cetera?

"[Braff:]  Yeah.  Beyond that, [']You need to stop this, and get into treatment,['] for what he called transference, which actually is pretty accurate here, the issue of transference.

"[Client]:  Objection, Your Honor.  We did stipulate to the report, and—

"The Court:  Overruled.

"[Attorney's attorney]:  You saw, I assume, a couple of times when [Attorney] told [Client] he thinks she's undergoing transference, which is a relatively common problem between doctors and patients and lawyers and clients and other relationships. And even gave her links to look it up, and told her to go see her therapist, correct?

"[Braff:]  Yeah.  [¶]  . . .  [¶]  . . . Here's what transference is simply.  It's when—I'll talk about the patient.  When a patient engages with—usually, with a psychotherapist or psychiatrist or other doctors, they tend to project or put their inner feelings for authority figures onto that other person."

Braff explained that when a person experiencing transference is rejected, they tend to become either depressed or "extremely angry at authority figures who almost inevitably will disappoint them because you can't meet unrealistic expectations."

Attorney's attorney asked Braff to explain delusional erotomania.  Braff replied, "[E]rotomania is a, you know, romantic or romantic feelings that get very intense, like, I

want to have your children, to someone that you never physically actually met. And the delusion is—because you have these expectations that are not realistic, the delusion is [an] unrealistic belief that is not grounded in reality, like, he's going to father her children. He, being [Attorney]."

**DISCUSSION**

A.    <u>EXPERT TESTIMONY</u>

Client contends the trial court erred by overruling her objection to Braff's testimony about transference because that topic was not included in Braff's report.

The purpose "of the expert witness discovery statute is to give fair notice of what an expert will say at trial." (*Bonds v. Roy* (1999) 20 Cal.4th 140, 146-147) We apply the abuse of discretion standard of review in determining whether the trial court erred by overruling Client's objection to Braff's testimony being beyond the scope of his report. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 663.)

Braff's report reads, "[Client] (from her emails) seems to have been very attached to [Attorney] and then to be severely disappointed and even vengeful for what she perceives to be unfair treatment. This approaches what has been called delusional erotomania." Delusional erotomania is intense romantic feelings that are not grounded in reality.

Transference involves projecting one's feelings onto an authority figure along with unrealistic expectations. Transference is very similar to delusional erotomania because both involve feelings for another person that are not based in reality. Because transference and delusional erotomania are so closely linked, it was within the scope of

7

Braff's report to testify about transference. Moreover, Braff's report referenced as source material the "extensive emails" between Attorney and Client, and those emails explicitly and repeatedly discuss transference. Therefore, the idea of transference was incorporated by reference into Braff's report. In sum, Client had fair notice that Braff could testify about transference. The trial court did not abuse its discretion.

B.     IMPEACHMENT EVIDENCE

1.     *ANGELINE ZAHABI*

a.     Procedural History

In a deposition, Attorney denied having dated a client or engaging in intercourse with a client. When asked, in the deposition, if he " 'had any romantic experience with a client,' " Attorney responded, " 'I may have, sure.' " During an Evidence Code section 402 hearing, Attorney clarified that he "became very close in texts" with one client, Angeline Zahabi (Zahabi), "but there was no dating, there was no sex" and they "mutually decided not to move forward on it." Attorney testified, "I would characterize it more as a close friendship than a relationship."

Copies of the text messages between Attorney and Zahabi do not appear in the record. We have located, in the reporter's transcript, the trial court reading aloud some of the text messages. The trial court said, "It says, 'August 7th, 2018. It says, 'You chased me from September.' This, apparently, is [Attorney] writing to Ms. Zahabi. 'I declined your case, and you couldn't let it go. You came back and sold me I'm a victim role knowing from reviews I was kind, compassionate, and helpful.' It says, 'You masturbated after our first phone conversation before we met, and which suggests you

8

were relishing how you were going to take advantage of me.' [¶] But he is clearly saying that he wants to leave her. At the very end, he says, 'Do not contact me, period, ever.' Ms. Zahabi writes back to him shortly thereafter or the same day. She says that he has been—'This is scary. Are you referring to everything to make me look like someone is harassing you?' And then it kind of goes back and forth. [¶] [Attorney] writes back a very short thing that says, 'Bottom line, you are lovable, but I can't give you the unconditional love you describe.' And I think at that time he's ending it at that time."

Client sought to introduce Zahabi and Attorney's text messages into evidence. The trial court said to Client, "[T]he only evidence I have is he has denied that he had—in fact, the e-mails don't say that they had a sexual relationship or anything at all, that they were talking. It does seem like a period of intense infatuation with each other over a short time, and then it ended. [¶] I'm still not seeing that this would survive, in my opinion, a 352 objection." The trial court excluded the text message and email evidence pertaining to Zahabi.

### b. Analysis

Client contends the trial court erred by excluding "impeachment evidence regarding the email and text messages" between Attorney and Zahabi. Client asserts the evidence was relevant to contradicting Attorney's testimony "that he did not date clients."

" '[Impeachment] evidence is relevant and thus admissible if it "tend[s] to disprove a fact of consequence on which the defendant has introduced evidence."

9

[Citation.]  The trial court is vested with broad discretion in determining the admissibility of [impeachment] evidence.' "  (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 27.)  We apply the abuse of discretion standard of review.  (*People v. Mills* (2010) 48 Cal.4th 158, 195.)

As to Zahabi, the text messages that the trial court read into the record do not indicate that Attorney and Zahabi were dating.  Rather, the text messages indicate that Attorney believed Zahabi wanted to have a romantic relationship with him.  In Attorney's deposition, he admitted that he may have had a romantic experience with a client, i.e., romantic text messages from Zahabi.  We do not see anything in the text messages reflecting that the two dated.  As a result, the text messages would not impeach Attorney on his testimony that he never dated a client.  Thus, the trial court did not err.

2.  *SARA CORREA*

a.  Procedural History

Sara Correa (Correa) is a former client of Attorney.  Client deposed Correa, but Client does not direct us to a copy of Correa's deposition transcript in the record.  However, in the reporter's transcript, Client read aloud a portion of Correa's transcript:
" 'Were you satisfied with [Attorney's] representation?'

"She says, 'No, I was not.'

" 'What happened during his representation that caused you to feel this way?'

"And she said, 'Since a lot of it has been a blur, what I understand was he didn't really fulfill what he said he was going to fulfill as far as representation, and he was

inappropriate in a way he spoke with me via text. And I expressed that on the Yelp, which is my right, and I was threatened afterwards.['] "

"I asked her, 'Can you tell me, Ms. Correa, what [Attorney] had done prior to you leaving this review?' And she says, 'So I don't recall the exact conversation, but I just remember it being inappropriate and I felt like I was being sexually exploited in a way.' " Allegedly, Correa offered "to trade sex for legal services."

The trial court said that Correa accused defendant of making sexual advances, "but there's nothing else—there's nothing in the deposition whatsoever of exactly what he even did or—and the deposition is not clear at all in that regard." The trial court concluded, "Under 352, the Court can't allow evidence that would be speculative or let the jury, quite frankly, speculate, because it would be much more prejudicial than probative." The trial court excluded Correa's deposition.

b.      Analysis

Client asserts Correa's deposition was relevant to contradicting Attorney's testimony "that he did not date clients"; Client contends the trial court erred by not permitting Client to impeach Attorney with Correa's deposition. There is nothing in the portion of the deposition read into the record that indicates Correa and Attorney dated. Rather, the indication is that Attorney declined Correa's offer to trade intercourse for legal work. Because the deposition does not contradict Attorney's testimony that he never dated a client, the trial court did not err in excluding the deposition.

Client asserts Correa's deposition should have been admitted to prove Attorney's pattern of "try[ing] to flip things on the woman and make it appear she was either crazy

11

or she was the aggressor." Client is not describing impeachment evidence pertaining to dating. Rather, she is describing evidence of a pattern or practice of misrepresenting other people's actions. Due to Client switching theories, she has failed to demonstrate that the trial court erred.

## DISPOSITION

The judgment is affirmed. Respondent is awarded his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.