[No. B224316. Second Dist., Div. One. Sept. 27, 2011.]

ROBERT DOZIER, Plaintiff and Appellant, v.
MICHAEL R. SHAPIRO et al., Defendants and Respondents.

**COUNSEL**

Law Office of Gerald Philip Peters, Gerald Philip Peters; Law Offices of Scott D. Bernstein and Scott D. Bernstein for Plaintiff and Appellant.

Carroll, Kelly, Trotter, Franzen & McKenna, John C. Kelly and David P. Pruett for Defendants and Respondents.

OPINION

**CHANEY, J.**—Plaintiff Robert Dozier appeals from a judgment in favor of defendants Michael R. Shapiro, M.D., and Michael R. Shapiro, M.D., Inc. (collectively Dr. Shapiro), in his action against them for medical malpractice. Plaintiff contends that the trial court committed reversible error by precluding his expert from testifying at trial that Dr. Shapiro's treatment of Dozier fell below the standard of care, resulting in the dismissal of the action due to Dozier's inability to prove the elements of his claim. We conclude that the trial court committed no prejudicial error.

## Factual Background

In an April 2008 complaint, Dozier alleged that Dr. Shapiro and his clinic were guilty of professional negligence in their surgical treatment of Dozier's left knee.[1] In July 2007, Dr. Shapiro had performed a "high tibial osteotomy of the left knee with internal fixation with plate and screws in the proximal tibia." Dozier alleged that after the surgery he continued to experience pain and other symptoms, leading him to seek additional medical care that revealed mechanical complications associated with a screw Dr. Shapiro had implanted, leading eventually to a total left knee replacement in March 2008. Dozier alleged that Dr. Shapiro's care and treatment of him "fell below the applicable standard of care" and was a substantial factor in causing injury, for which he sought damages. Trial was initially scheduled for April 13, 2009.

On January 16, 2009, defendants deposed Dr. Eric Zeegen, the physician who performed Dozier's knee replacement, as a treating physician. Dr. Zeegen testified at his deposition that when he treated Dozier after Dr. Shapiro's osteotomy, "it looked like the screw had penetrated into the joint." But when he was asked whether he had formed an opinion that Dr. Shapiro had placed the screw improperly, Dozier's counsel objected: "Calls for speculation, for an expert opinion. He's not being deposed as an expert. [¶] . . . [¶] You're asking for an expert opinion. It goes beyond the care and treatment."

After the objection, Dr. Zeegen testified that whether Dr. Shapiro had placed the screw improperly in the first instance, or it had migrated into the joint over a period of time, is "hard to say." That determination would require him "to look at serial x-rays from immediate postoperatively to over the course of time" before Dozier had come to him, an examination Dr. Zeegen had not done. Later in the deposition Dozier's counsel objected to questions about whether Dr. Zeegen's own medical practice included performing high

---

[1] Plaintiff dismissed defendant Los Angeles Knee & Sports Medicine Clinic with prejudice during pretrial proceedings.

tibial osteotomies, and about whether Dr. Zeegen advised his own patients that screw migration is a risk associated with high tibial osteotomies. To these questions Dozier's counsel objected because "[y]ou're asking him questions that go way beyond the care and treatment of Mr. Dozier in this case. You're not deposing him as an expert, so you're asking improper expert opinions that call for expert opinions . . . ." "That's an improper—he's not being deposed as an expert. . . . He's here to answer questions about care and treatment of Mr. Dozier in connection with the knee replacement, end of story. [¶] . . . [¶] He's not being deposed as an expert in high tibial osteotomies." During the course of his objections, Dozier's attorney stipulated that "if we designate experts, and [Dr. Zeegen] happens to be one of them, you can redepose him as an expert."

On February 2, 2009, Dr. Shapiro's counsel served a demand to exchange lists of expert witnesses. Pursuant to Code of Civil Procedure section 2034.210, the demand advised that the list of witnesses "must contain the name and business or residence address of each expert you expect to call in person or through deposition, and you must give a narrative statement of the qualifications of each such expert witness, the general substance of the testimony that each such expert witness is expected to give at the time of trial, and the fee charged by each such expert." It advised (in uppercase font) that a failure to comply with these requirements would constitute a waiver "of your right to call unlisted expert witnesses at the time of trial."

Dozier's February 20, 2009 response to the demand for an exchange of expert witness lists stated, "Plaintiff intends to call various treating health care providers as expert witnesses at trial," who "are regarded as percipient witnesses not retained experts." Dr. Zeegen was among the nine "non-retained percipient experts whose testimony may be elicited at the time of trial" listed in Dozier's response. The response went on to explain that "[b]ecause treating physicians and other healthcare providers are not 're-tained' expert witnesses within the meaning of <u>Code of Civil Procedure</u>, §2034(a)(2), no declaration is required for these witnesses (see [<u>Schreiber v. Estate of Kiser</u>] (1999) 22 Cal.4th 31 [91 Cal.Rptr.2d 293, 989 P.2d 720]). Generally however, Plaintiff expects these treating healthcare providers to testify about their care and treatment, diagnosis and prognoses of Plaintiff at and during the relevant time period they were or still are treating healthcare providers."[2] The response advised also that the listed health care providers who had treated Dozier for "the condition resulting from the incident which gives rise to this action" would also testify "about standard of care, causation, damages," and related subjects. Dozier's response also reserved a right to call and/or designate additional experts, "and should the need to do so arise, will

---

[2] The response's citation to Code of Civil Procedure section 2034, subdivision (a)(2) was later identified as an outdated reference to an earlier version of section 2034.210.

notify all counsel immediately and make such experts available for deposition." The response did not include any statement of the qualifications, the general substance of anticipated testimony, or the fees charged by Dr. Zeegen or any other of the listed possible expert witnesses.

On May 21, 2009, Dozier filed a joint list of proposed witnesses, which listed three expert witnesses—not including Dr. Zeegen—whose testimony would include the subjects of "liability, causation and damages." Dr. Zeegen was identified on the list as a "Treating Doc/Expert" who would testify only on "the need for surgery as well as the need for future surgeries, knee revisions and replacements."

Trial was delayed by various circumstances until late February 2010. On May 1, 2009, Dr. Shapiro filed a motion under *Kennemur v. State of California* (1982) 133 Cal.App.3d 907 [184 Cal.Rptr. 393] (motion in limine No. 6), seeking to limit the trial testimony of Dozier's experts (including Dr. Zeegen) to the opinions rendered at their depositions. After argument over a period of days, on February 11, 2010, the trial court granted motion in limine No. 6 to exclude Dr. Zeegen's testimony to the extent his opinions would be based on information received after his deposition and not from information he obtained in the course of his treatment of Dozier. That ruling was based on the court's conclusion that Dr. Zeegen's opinions at trial would be based on information he had been provided after his deposition. By providing that information and engaging Dr. Zeegen to provide those opinions, the court concluded, Dr. Zeegen's status was transformed from that of simply a treating physician into that of a retained expert. The ruling limited the testimony of Dr. Zeegen to the opinions he had formulated at the time of his deposition and, specifically, it precluded him from testifying to anything based on information provided to him after his deposition.

Because Dozier's counsel represented that Dr. Zeegen had testified at his deposition that Dr. Shapiro had breached the standard of care, on the morning trial was to commence the court held a hearing under Evidence Code section 402 and voir dire examination of Dr. Zeegen, to determine whether Dr. Zeegen's deposition testimony (and therefore the testimony he would be permitted to offer at trial) could satisfy Dozier's burden of proof on the standard of care issue.[3] Following the hearing Dr. Shapiro sought dismissal of the case, arguing that Dr. Zeegen had not testified at his deposition that Dr. Shapiro's treatment of Dozier fell below the standard of care, and that the voir dire examination established that he had formulated his standard of care opinion only after he had examined X-rays and other documents provided to him after his deposition had been taken. Dozier's counsel argued, to the

---

[3] Dozier's counsel informed the court that Dr. Zeegen was his only potential witness on the issues of standard of care and causation.

contrary, that Dr. Shapiro had not been asked at his deposition about the standard of care issue, and (somewhat inconsistently) that his deposition testimony was sufficient to satisfy Dozier's burden on the issue.

After reviewing Dr. Zeegen's deposition testimony in detail, the trial court concluded that at his deposition Dr. Zeegen had testified that he had not then formulated an opinion about either whether Dr. Shapiro's treatment fell below the standard of care, or the extent to which Dozier's osteoarthritic condition had resulted from Dr. Shapiro's treatment. Having read the deposition, the court found that "there isn't anything there that can go to the jury."

Finding that Dozier's request that he formulate opinions and testify to opinions based on materials he had been provided only after his deposition (not in connection with his treatment of Dozier) had transformed Dr. Zeegen into a retained expert, the court held that Dozier's counsel was obligated to notify opposing counsel of the change in Dr. Zeegen's status—which he had not done.[4] The court then granted Dr. Shapiro's motion to dismiss the case.

## Discussion

The appeal contends that the trial court abused its discretion by dismissing the case because Dr. Zeegen's status as a treating physician obviated any expert witness declaration from him, and in any event Dozier had substantially complied with the expert witness declaration requirement; because Dozier had not unreasonably failed to comply with the expert witness exchange requirements (and the court made no finding that he had); and because defendants had failed to question Dr. Zeegen about his opinions on the standard of care issue at his predesignation deposition, and in any event Dr. Zeegen had testified at his deposition that Dr. Shapiro's treatment of Dozier breached the applicable standard of care. These contentions have no merit.

We review the trial court's rulings for abuse of discretion. (*Mateel Environmental Justice Foundation v. Edmund A. Gray Co.* (2003) 115 Cal.App.4th 8, 25 [9 Cal.Rptr.3d 486] [abuse of discretion standard governs rulings on admissibility of expert testimony].)

---

[4] To the argument of Dozier's counsel that the defense did not seek to depose Dr. Zeegen as an expert once he had been properly designated in the expert witness information exchange, the court responded: "You're blaming the other side for not reading your mind that you had decided to ask the treating physician to do additional work after his deposition as the treating physician and to give him materials that he didn't have access to as the treating physician. That took him out of the context of a treating physicist [*sic*] . . . ." "[O]nce you turn him into a different kind of witness, he's no longer just a treating physician."

1. *It Is Not True That Dr. Zeegen Was Not Asked at His Deposition About the Standard of Care Issue, or That He Testified That Dr. Shapiro's Treatment of Dozier Breached the Applicable Standard of Care.*

Dozier's appeal contends that "Dr. Zeegen was not asked whether he had an opinion as to whether Dr. Shapiro complied with the applicable standard of care or, if he did have an opinion, to state his opinion. Further Dr. Zeegen's testimony, reasonably construed, stated an opinion that Dr. Shapiro breached the applicable standard of care." From these conclusions Dozier implies that the defense either had adequate notice of the opinions to which Dr. Zeegen would testify at trial, or that if it did not, it was their own fault. The record does not support these contentions.

The opening brief cites what it represents to be "all occasions on which [Dr. Zeegen] was asked to state opinions, directly or indirectly, regarding care Dr. Shapiro provided" to Dozier. It characterizes Dr. Zeegen's testimony as containing opinions that (1) the screw was in Dozier's knee joint; (2) Dr. Shapiro placed the screw either in the joint or very close to the joint; (3) Dr. Shapiro's responsibility, as surgeon, was to place the screw so that it did not migrate into the joint; and (4) the screw's presence in the joint probably contributed to Dozier's arthritis, which had caused Dozier's need for knee-replacement surgery.[5]

---

[5] For these propositions, the opening brief cites Dr. Zeegen's deposition testimony that when he first discussed Dozier's case with plaintiff's counsel "it looked like that there had been a screw that had been placed in the joint that may or may not have contributed to the patient developing arthritis," and that at that time its seemed to him "[p]robably more probable" than not that the screw's location had contributed to the arthritis. It cites Dr. Zeegen's testimony that "[i]t's hard to tell whether the screw was initially placed there or it was originally in a lower position and then there was settling at the osteotomy site and then pushed through. I would need to look at serial x-rays from immediate postoperatively to over the course of time to when he came to see Dr. Hollander." It cites Dr. Zeegen's testimony, when asked whether he had formed an opinion that the screw had been placed improperly, that "[m]y recollection of looking at all of the x-rays, and I don't have—it's a somewhat vague recollection, but that was that the screw was awfully close to the joint surface from the very get-go and whether or not it had already—whether it had been placed into the joint initially or had migrated into the joint over a period of time, it is hard to say." It cites Dr. Zeegen's testimony that it is "a very difficult question to answer" whether he believed "that the fact that the screw had migrated into the joint contributed to the fact that he had no remaining cartilage," although "[t]here was a fair amount of arthritis there to begin with," i.e., before Dr. Shapiro's surgery. "A screw being in the joint, though, probably accelerated whatever arthritic changes there were to begin with." And it cites Dr. Zeegen's testimony that he doubted many orthopedic surgeons would seek a patient's consent with respect to potential screw migration because "when you put a screw in, your responsibility as a surgeon is to make sure the screw is in bone properly, getting a good bite, such that it really shouldn't migrate. So I don't know that people would include something in a consent that would end up being a failure of the technique of the surgery." Screw migration would be "a complication," rather than "a risk" of the surgery.

The trial court correctly found that the testimony does not amount to a statement of Dr. Zeegen's expert opinion that Dr. Shapiro had actually placed the screw improperly in the joint where it had contributed to Dozier's need for a knee replacement, thus breaching the applicable standard of care and causing Dozier's damages. It says that when Dozier came to Dr. Hollander sometime after Dr. Shapiro had performed the osteotomy, the screw was protruding into the joint; that he then believed Dr. Shapiro apparently had placed the screw very close to the joint; and that Dr. Shapiro had a responsibility, as surgeon, to place the screw so that it would not migrate into the joint. Taken alone, these responses suggest that Dr. Zeegen might initially have concluded that there might have been a problem with Dr. Shapiro's placement of the screw, because it wound up protruding into the joint; but his testimony did not go that far.

In addition, the remainder of Dr. Zeegen's testimony precluded any possibility that Dr. Zeegen was then testifying to an expert opinion that Dr. Shapiro's placement of the screw had been below the applicable standard of care. And Dozier's counsel's objections and positive representations informed counsel that Dr. Zeegen's testimony to such a conclusion would not be offered—at least, not without his designation as a retained expert (which never occurred).

Dr. Zeegen testified at his deposition that he had not been retained as an expert witness in this litigation, and that all his opinions "are based on my treatment provided to this patient, as well as my experience and qualifications . . . ." He testified that in order to determine whether the screw had been initially placed in the joint or had later "pushed through," Dr. Zeegen "would need to look at serial x-rays" that he had not examined at the time of his deposition—indicating that without further information he could not form an opinion as to the propriety of Dr. Shapiro's treatment. Other than the opinions expressed in his treatment notes, Dr. Zeegen testified, he had no other opinions regarding the medical or surgical treatment given by Dr. Shapiro at the time of Dozier's surgery.

At the trial court's hearing under Evidence Code section 402, evaluating the sufficiency of plaintiff's anticipated evidence on the standard of care issue, Dr. Zeegen confirmed that he "did not have enough information at [his deposition] to form an opinion or impression as to whether or not the standard of care had been met or breached by Dr. Shapiro back in 2007." At his deposition, he confirmed, he "did not express any criticisms of Dr. Shapiro's care and treatment" of Dozier. It was only a year later—after "I was asked to be an expert witness last month, in January of [2010]"—that he had received Dr. Shapiro's medical records and deposition, enabling him to formulate an opinion as to whether Dr. Shapiro's treatment of Dozier had or had not complied with the standard of care.

Counsel's conduct at Dr. Zeegen's deposition was consistent with this conclusion—and no other. Dozier's counsel objected when Dr. Shapiro's counsel inquired about whether Dr. Shapiro's placement of the screw had been improper, insisting that Dr. Zeegen was "not being deposed as an expert," but only as a treating physician, and representing that the question about the propriety of Dr. Shapiro's placement of the screw "[h]as nothing to do with when [Dr. Zeegen] was treating him or what he did as far as the care and treatment goes." Dozier's counsel repeated his representation that Dr. Zeegen was "here to answer questions about care and treatment of Mr. Dozier in connection with the knee replacement, end of story. [¶] . . . [¶] He's not being deposed as an expert in high tibial osteotomies." And while plaintiff's counsel expressed his willingness to stipulate "if we designate experts, and [Dr. Zeegen] happens to be one of them, you can redepose him as an expert," Dr. Zeegen was never designated or identified as a witness whose testimony would be offered as a retained expert, or on the standard of care issue.[6]

On this record, the trial court was justified in concluding that Dozier failed to demonstrate at the Evidence Code section 402 hearing either that Dr. Zeegen had testified at his deposition that Dr. Shapiro's treatment had fallen below the standard of care, or that defendants had failed to ask him about his opinions on that subject.

2. *By Failing to Disclose the Substance of Dr. Zeegen's Anticipated Opinion Testimony, and That His Opinions Would Be Based on Information Received After His Deposition and Not Wholly from His Status as Dozier's Treating Physician, Plaintiff Did Not Substantially Comply with the Code Requirements for Expert Witness Designation.*

 In an exchange of expert witness information under Code of Civil Procedure section 2034.210, subdivision (a), a party may provide either "[a] list setting forth the name and address of any person whose expert opinion that party expects to offer in evidence at the trial" or "[a] statement that the party does not presently intend to offer the testimony of any expert witness." (Code Civ. Proc., § 2034.260, subd. (b)(1), (2).)[7] The responding party must also provide a narrative stating "the general substance of the testimony that the expert is expected to give." (*Id.*, subd. (c)(2).) As interpreted by case law, this requires a party to " ' "disclose the substance of the facts and the opinions to which the expert will testify, either in his witness exchange list,

---

[6] Although Dr. Zeegen was listed in Dozier's February 2009 response to the expert exchange demand as one of nine treating experts who might testify about standard of care, a few months later, on May 21, 2009, he filed a joint list of proposed witnesses that did not list Dr. Zeegen as one of the experts who would testify on the subjects of "liability, causation and damages."

[7] Further statutory references are to the Code of Civil Procedure unless otherwise specified.

or in his deposition, or both." ' " (*Easterby v. Clark* (2009) 171 Cal.App.4th 772, 778 [90 Cal.Rptr.3d 81], italics omitted; see *Kennemur v. State of California, supra*, 133 Cal.App.3d at p. 919.) After a witness has denied at his or her deposition having reached opinions on a particular subject, the defendant is entitled to rely on that disclaimer "until such time as appellant disclosed that [the expert] had conducted a further investigation and had reached additional opinions in a new area of inquiry." (*Kennemur*, at p. 920.) When counsel is not notified when the opposing party's expert witness formulates postdeposition opinions to be offered at trial, the witness is "in effect not made available for deposition as to the further opinions . . . ." (*Jones v. Moore* (2000) 80 Cal.App.4th 557, 565 [95 Cal.Rptr.2d 216].) " '[T]he very purpose of the expert witness discovery statute is to give fair notice of what an expert will say at trial. . . .' " " '[W]hen an expert is permitted to testify at trial on a wholly undisclosed subject area, opposing parties . . . lack a fair opportunity to prepare for cross-examination or rebuttal.' " (*Easterby v. Clark, supra*, 171 Cal.App.4th at p. 780, quoting *Bonds v. Roy* (1999) 20 Cal.4th 140, 146–147 [83 Cal.Rptr.2d 289, 973 P.2d 66].)

In *Easterby*, the plaintiff's expert testified at his deposition that he had formulated no opinion that the plaintiff's injury resulted from the defendant's allegedly negligent conduct, and that he had not been asked to testify on that subject at trial. And here, Dr. Zeegen testified at his deposition that he was unable to formulate an opinion as to whether Dr. Shapiro's treatment of Dozier was proper on the basis of the information he had then been provided. The facts of this case differ from those in *Easterby v. Clark*, in one critical respect: In *Easterby*, the plaintiffs had informed the defendants' counsel long before trial that the expert would testify at trial to the opinion he had disclaimed at his deposition, that the allegedly negligent event caused the plaintiff to require surgery.

Here, unlike in *Easterby*, Dozier's counsel did not disclose that Dr. Zeegen would testify at trial that Dr. Shapiro's treatment of Dozier fell below the standard of care. His response to the expert witness exchange, served February 20, 2009, listed nine doctors whose expert testimony "may be elicited at the time of trial," identifying them as "treating physicians" and "not retained experts." The response went on to say that no expert witness declaration was required for any of these expert witnesses, because they are not " 'retained' expert witnesses" within the code's meaning. Finally, the response stated that with respect to those of the listed experts who had treated Dozier's knee condition, it was anticipated that those unspecified experts "will testify about standard of care," among other topics; but it did not disclose the substance of Dr. Zeegen's anticipated testimony on any of those subjects; it did not disclose that his testimony on those subjects would be wholly different from his deposition testimony (where he denied having

formed any opinion on those subjects); and it did not disclose that his opinions on those subjects were based on materials that he was provided by counsel after his deposition had been taken, rather than in the course of his treatment of Dozier's condition. Plaintiff's counsel belatedly asked Dr. Zeegen, the treating physician, to become a retained expert, and gave him additional materials, which he reviewed. "And he testified that it was after that that he was able to come to a conclusion. So it seems to me perfectly clear, I can't let him testify as a retained expert." As the trial court concluded, "it's fundamental fairness."

The issue here is not whether an expert witness declaration is necessarily required when a treating physician testifies as an expert; it is not. (*Schreiber v. Estate of Kiser, supra*, 22 Cal.4th at p. 38.) As plaintiff's counsel repeatedly represented, Dr. Zeegen's role at his deposition was that of a treating physician, nothing more. "[H]e's not being deposed as an expert. . . . He's here to answer questions about care and treatment of Mr. Dozier in connection with the knee replacement, end of story. . . ."

■ A treating physician is not consulted for litigation purposes, but rather is qualified to testify about the plaintiff's injuries and medical history because of his or her underlying expertise as a physician and his or her physician-patient relationship with the plaintiff. A retained expert, on the other hand, is engaged for the purpose of forming and expressing an opinion in anticipation of the litigation based at least in part on information obtained outside the physician-patient relationship, for the purpose of the litigation rather than the patient's treatment. (*Schreiber v. Estate of Kiser, supra*, 22 Cal.4th at p. 36.)

A treating physician unquestionably may be designated as an expert, and may be qualified to testify (given an appropriate factual basis) on the subject of a defendant physician's adherence to the applicable standard of care. (*Schreiber v. Estate of Kiser, supra*, 22 Cal.4th at p. 39.) The code does not require an expert declaration with respect to a witness testifying as a treating physician, even if that testimony will include opinions with respect to subjects such as causation and standard of care. (*Ibid.*) Thus, to the extent that Dozier's counsel intended to present Dr. Zeegen's testimony only on the subjects on which he was qualified to testify by virtue of his physician-patient relationship with Dozier, the code required no disclosure of the anticipated substance of that testimony.

Dozier thus was entitled to present Dr. Zeegen's testimony as an expert on the basis of the facts he had learned and opinions he had formulated in connection with his physician-patient relationship and treatment of Dozier. But at his deposition, Dozier's counsel objected to any examination of Dr. Zeegen about the applicable standard of care and Dr. Shapiro's adherence

to it. Moreover, Dr. Zeegen denied having opinions on that subject, testifying that he could form those opinions only after examining additional records—records he had not examined in connection with his role as Dozier's treating physician.

In section 2034.210, the Legislature determined that the information required by the expert witness declaration "is unnecessary for treating physicians who remain in their traditional role." (*Schreiber v. Estate of Kiser, supra,* 22 Cal.4th at p. 38.) But when Dr. Zeegen received additional materials from counsel after his deposition, to enable him to testify to opinions about Dr. Shapiro's adherence to the standard of care—a subject on which he had formed no opinions in connection with his physician-patient relationship with Mr. Dozier—his role was not that of a treating physician, but became that of a retained expert. And as Dr. Zeegan was a retained expert, Dozier was required to disclose the information called for in section 2034.210, subdivision (b), including a summary of the substance of Dr. Zeegan's anticipated testimony. (§ 2034.210, subd. (b).)

Dozier's counsel transformed Dr. Zeegen, a treating physician, into a retained expert by giving him additional information and asking him to testify at trial to opinions formed on the basis of that additional information. But Dozier did not designate him as a retained expert, and did not disclose the substance of his anticipated testimony. As the trial court concluded, "I don't think that that is proper under either of these two cases [(*Kalaba v. Gray* (2002) 95 Cal.App.4th 1416 [116 Cal.Rptr.2d 570] and *Schreiber v. Estate of Kiser, supra,* 22 Cal.4th 31)], and I don't think it is within the spirit, the letter and spirit of the Discovery Act on expert witnesses."

■ The record shows without contradiction that at the time of his deposition Dr. Zeegen had not formulated an opinion on the subject of Dr. Shapiro's adherence to the standard of care, and that his later-formulated opinions on that subject were based on information he was provided by counsel after his deposition for the purpose of the lawsuit, rather than on the basis of his physician-patient relationship as Dozier's treating physician. On that record, the trial court correctly determined that Dr. Zeegen's trial testimony on the subject of the standard of care would be that of a retained expert rather than merely a treating physician, and was justified in precluding him from testifying to opinions he had formed for the litigation, including his opinions on the subject of Dr. Shapiro's compliance with the standard of care.

3. *Plaintiff's Failure to Comply with the Code's Expert Witness Exchange Requirements Was Unreasonable.*

■ The code's expert witness information exchange requirements are set forth in section 2034.210 and the provisions referenced in that section. So far

as relevant here, they provide that any party may demand a mutual and simultaneous exchange of information about all persons whose expert opinion the parties expect to offer at trial. (§ 2034.210, subd. (a).) As to any of those designated experts retained to form and express an opinion in anticipation of the litigation or in preparation for trial, a party's exchange must also include expert witness declarations that (among other information) identifies that expert and his or her qualifications, and contains "[a] brief narrative statement of the general substance of the testimony that the expert is expected to give." (§ 2034.260, subd. (c)(2).)

Quoting from the opinion in *Bonds v. Roy, supra,* 20 Cal.4th 140, Dozier correctly identifies that the purpose of these provisions is "to give fair notice of what an expert will say at trial." The code's requirements force this result in order to "allow[] the parties to assess whether to take the expert's deposition, to fully explore the relevant subject area at any such deposition, and to select an expert who can respond with a competing opinion on that subject area." And as the court noted in *Kabala v. Gray, supra,* 95 Cal.App.4th at page 1424, "there are many medical malpractice cases in which an effort to depose *all* treating physicians would be both unnecessary and prohibitively expensive." By requiring the parties to provide a summary of each potential expert's anticipated testimony, the expert witness designation procedures provide the parties with the ability to intelligently determine which of the opposing party's potential expert witness physicians do, and do not, need to be deposed before trial.

Defendants took Dr. Zeegen's deposition as a treating physician on January 16, 2009. Dr. Zeegen testified that he was unable to determine whether Dr. Shapiro's treatment of Dozier fell below the applicable standard of care—whether "the screw had been placed improperly by Dr. Shapiro"—and that in order to do so "I would need to look at serial x-rays from immediate postoperatively to over the course of time . . . ." He expressed no other opinions on that subject, and disclaimed having any other opinions. And Dozier's counsel went so far as to object, representing that the subject was not one on which Dr. Zeegen's expert opinions were being offered. Whether Dr. Shapiro's placement of the screw was improper, he objected, "[h]as nothing to do with when he was treating him or what he did as far as the care and treatment goes." Dr. Zeegen's deposition therefore was taken as a treating physician only, and *not* as a retained expert.

About two weeks later, on February 2, 2009, defendants served their demand for an expert witness exchange under section 2034.210. Plaintiff's response did not inform them of any change in Dr. Zeegen's status, or in his testimony. It did not "give fair notice of what [Dr. Zeegen] will say at trial"; and because it did not do so, it did not afford defendants an opportunity "to

assess whether to take [Dr. Zeegen's] deposition" as a retained expert—the purpose of the exchange. (*Bonds v. Roy, supra*, 20 Cal.4th at pp. 146–147; see *Kabala v. Gray, supra*, 95 Cal.App.4th at p. 1424.) That response fulfilled neither the letter nor the spirit of the code's expert witness exchange provisions. It did not identify Dr. Zeegen as having been retained for the purpose of forming and testifying to opinions as to standard of care; to the contrary, it said that he (and the eight other listed potential witnesses) would testify only as treating physicians, therefore basing any opinions to which they might testify on information gained by virtue of their physician-patient relationship with Dozier rather than on information provided to them in connection with the litigation. And by saying that some of the designated treating physicians might testify on the subject of standard of care, it did not inform defendants Dr. Zeegen's trial testimony would be different from that he gave at his deposition, where he testified he had no opinion that Dr. Shapiro had improperly placed the screw in Dozier's knee.

The response therefore only reinforced the strong message that had been communicated at Dr. Zeegen's deposition, that Dr. Zeegen *was not* among the physicians from which plaintiff would obtain evidence about the standard of care issue. From the response, defendants' counsel could only have concluded that Dr. Zeegen would not be among the listed treating physicians from whom plaintiff might seek opinion testimony on that subject. No other conclusion would be consistent with the information provided.

In *Easterby v. Clark, supra*, 171 Cal.App.4th 772, we held that the trial court abused its discretion by precluding the testimony of the plaintiffs' expert and dismissing the case for the plaintiffs' resulting inability to prove the essential element of causation. The same legal principles require us to conclude in this case that the trial court properly barred Dozier's expert from testifying on the issue of standard of care, and then dismissed the case due to Dozier's resulting inability to prove that essential element of his malpractice cause of action. In *Easterby*, a few months after the plaintiffs' designated expert witness had testified at his deposition that he had no opinion on the causation issue, and about three months before trial, the plaintiffs informed the defendants' counsel that the expert would testify at trial that the allegedly negligent act had caused the need for surgery; yet the defendants did not seek to redepose the expert.

█ These facts distinguish the circumstances of this case from those in *Easterby v. Clark.* "The overarching principle in *Kennemur, Jones*, and *Bonds* is clear: a party's expert may not offer testimony at trial that exceeds the scope of his deposition testimony *if* the opposing party has no notice or expectation that the expert will offer the new testimony, or *if* notice of the new testimony comes at a time when deposing the expert is unreasonably

difficult." (*Easterby v. Clark, supra*, 171 Cal.App.4th at p. 780.) Here, Dozier's counsel never informed defendants about Dr. Zeegen's postdeposition change of testimony, and therefore never gave them the opportunity to request a renewed deposition on that subject. The purpose of the expert witness exchange was not fulfilled by plaintiff's response.[8] As the court found in *Kabala v. Gray, supra*, 95 Cal.App.4th at page 1424, "we see absolutely . . . no reason to reward a party whose lawyer has failed to comply with either the letter or the spirit of the Civil Discovery Act."

## Disposition

The judgment is affirmed. Defendants to recover their costs.

Rothschild, Acting P. J., and Johnson, J., concurred.

---

[8] The trial court suggested, before hearing Dr. Shapiro's motion in limine, that if the parties believed there might be a problem with respect to expert depositions it would simply order a supplemental deposition before trial. But apparently because he never acknowledged that Dr. Zeegen's testimony would be that of a retained expert, Dozier's counsel had not requested such an order, and in any event has not contended that the trial court would have had discretion to deny it.